NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0297n.06

No. 13–4269

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JOHN F. SMITH, Jr., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| CHARLOTTE JENKINS, Warden, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

FILED
Apr 23, 2015
DEBORAH S. HUNT, Clerk

**BEFORE: GUY, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** An Ohio jury convicted John Smith, Jr., of felonious assault, Ohio Rev. Code 2903.11, and involuntary manslaughter, Ohio Rev. Code 2903.04, after finding that he punched and ultimately caused the death of Bryan Biser. Smith was sentenced to eight years' imprisonment after the trial court merged his convictions. In this petition for a writ of habeas corpus, Smith only challenges his involuntary-manslaughter conviction, arguing that his trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for not investigating or presenting evidence that Biser's death resulted from a pre-existing medical condition, not Smith's punch. The district court denied Smith's petition.

For the reasons set forth below, we hold that Smith did not procedurally default his *Strickland* claim and that Smith's habeas petition should be granted because his trial attorney did not function as counsel guaranteed by the Sixth and Fourteenth Amendments. We **REVERSE** the judgment of the district court and **REMAND** with instructions to enter a conditional writ of habeas corpus giving the State of Ohio six months to retry or dismiss the involuntary-

manslaughter charge, and further providing that if the state chooses to dismiss the charge, it shall resentence Smith on the remaining felonious-assault conviction.[1]

## I.

On April 15, 2005, a fight broke out between two five-year-old boys in an apartment complex's playground. One of the boys was Smith's nephew, and rather than try to stop the fight, Smith began yelling obscenities and encouraging his nephew to beat up the other boy. Other residents of the apartment complex who saw this, including the other boy's mother, objected to Smith's behavior and began arguing with him. Biser, a bystander, saw the argument unfolding and attempted to diffuse the situation: he asked everyone to "calm down," approached the group in a non-aggressive manner, did not touch anyone, and did not appear to be threatening. Nevertheless, Smith walked up to Biser and "sucker-punched" him on the left side of his head. Biser was knocked back and, while falling, hit his face on a parked car before the back of his head hit the pavement, causing him to begin bleeding from the head. Biser initially laid on the ground unconscious and could not breathe; he then went in and out of consciousness, convulsed on the ground, breathed in a manner described as "snoring," and was extremely disoriented. Smith fled the scene.

Approximately fifteen minutes passed before the paramedics arrived and administered emergency treatment to Biser. Biser told the paramedics he was a Type-1 diabetic and that he had taken his insulin that day.[2] The paramedics could not confirm that Biser had taken his

---

[1] Involuntary manslaughter is a first-degree felony, Ohio Rev. Code 2903.04, and felonious assault is a second-degree felony, Ohio Rev. Code 2903.11. During the relevant period, a first-degree felony carried a maximum penalty of ten years, *see, e.g.*, *State v. Moore*, 2006 WL 202756 (App. Ct. Ohio Jan. 26, 2006), and a second-degree felony a maximum penalty of eight years, *see e.g.*, *State v. Seavey*, 2006 WL 847114 (App. Ct. Ohio Mar. 31, 2006). Although Smith's eight-year sentence does not exceed the maximum sentence for a second-degree felony, it is unclear whether he would have received the same sentence without the first-degree felony conviction.

[2] In April 2004, about one year before this incident, Biser had been diagnosed with Type-1 diabetes; however, Biser did not seek professional treatment, obtain prescriptions, or otherwise learn how to properly manage his diabetes.

insulin, however, because their machine that measured blood-glucose levels malfunctioned. When he arrived at the hospital, it was determined that Biser had a blood-glucose level of 465— over three times the "typical" blood-glucose level—indicative of a highly irregular metabolic state requiring immediate medical attention.

The emergency room doctor treated Biser and prescribed him insulin, but Biser told the doctor that he had insulin at home and did not want to purchase prescription insulin from the hospital. The doctor also recommended that Biser undergo a CT-scan to examine the extent of his head injuries, but Biser refused. Biser was able to answer the doctor's questions and follow his commands appropriately. He was deemed competent to refuse treatment and was discharged from the hospital with instructions to return if he experienced vomiting, confusion, or vision problems.

When Biser returned to his apartment later that night, he was very confused. He told his neighbors that he had been out singing karaoke, apparently forgetting that he had been punched and taken to the hospital. Over the next three days, Biser did not leave his apartment. Biser's cousin visited him, noticed that he was not acting like himself, and confirmed that he had been taking his insulin, although she had no way of knowing if he was taking the appropriate dosages. Despite feeling ill and remaining confused, Biser did not return to the hospital.

Four days after being punched, on April 19, 2005, Biser was found lying on the floor of his apartment in a hypoglycemic coma, unconscious, and struggling to breathe. His left arm and both of his feet had turned black. Paramedics arrived and determined that Biser's blood-glucose level was 28, a dangerously low level resulting from an overdose of insulin. When paramedics arrived they administered glucagon, a treatment used to quickly raise blood-glucose levels,

before transporting Biser to the hospital. By the time he arrived at the hospital, Biser's blood-glucose level had skyrocketed to 1,169—nearly ten times the "typical" level.

At the hospital, a CT-scan showed that Biser had a possible skull fracture, a subdural hematoma, and subarachnoid hemorrhage. These injuries alone are generally not fatal, but a radiologist testified at trial that he had "never seen anyone with this sort of injury be able to function."[3] Biser was also diagnosed with "severe diabetic ketoacidosis," a lethal condition caused by his failure or inability to properly administer himself insulin.

Given his dire condition, Biser was transferred to a larger hospital where he underwent exploratory abdominal surgery, which revealed that his small bowel and a portion of his right colon were necrotic. Biser died a few hours later, five days after Smith punched him, and about one year after he was diagnosed with Type-1 diabetes.

The cause of Biser's death was ultimately determined to be diabetic ketoacidosis. However, at trial a medical examiner opined that blunt force trauma was "the underlying cause of [Biser's] death" because the injuries to Biser's frontal lobe "affected how [Biser] looked after himself" and therefore left him unable to properly administer insulin. Smith's trial counsel's theory was that Biser had fallen down the steps in his apartment; trial counsel failed to present any evidence regarding Biser's metabolic state or explore the nature of Biser's undisputed cause of death, diabetic ketoacidosis. The jury convicted Smith of both felonious assault and involuntary manslaughter and the court sentenced him to eight years' imprisonment.

---

[3] At argument, Smith's counsel stated that this conclusion was seemingly contradictory based on other statements made by the witness. The radiologist testified that individuals with these types of injuries have "a wide range of" symptoms, but immediately followed that statement with "I have never seen anyone with this sort of injury be able to function." Taken together, this testimony is not contradictory; rather, the radiologist testified that Biser's injuries could trigger a wide variety of symptoms, all of which could render him unable to function.

**II.**

Because the district court did not hold an evidentiary hearing, we review the district court's legal conclusions and factual findings *de novo.*  *Northrop v. Trippett*, 265 F.3d 372, 377 (6th Cir. 2001); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), governs review of Smith's petition.  28 U.S.C. § 2254.  Section 2254 requires heightened deference in our review of "any claim *that was adjudicated on the merits* in State court proceedings."  28 U.S.C. § 2254(d) (emphasis added).

In determining whether AEDPA's heightened deference applies to Smith's case, we look to the "last reasoned [state-court] opinion" to address Smith's ineffective-assistance-of-counsel claim.[4]  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc) (holding that this court must "look to the last reasoned state-court opinion to determine the basis for the state court's rejection of [petitioner's federal constitutional] claim."); *see also Woolley v. Rednour*, 702 F.3d 411, 422 (7th Cir. 2012); *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009) (finding that lower state-court decision was not subject to AEDPA deference, noting that "the Pennsylvania Supreme Court decided Thomas' claims on purely procedural, not substantive grounds.  This decision stripped the [lower] court's substantive determination of Thomas' claims of preclusive effect.").  Under this framework, if "the last reasoned opinion on the claim explicitly imposes a procedural default, [this court] will

---

[4] We have consistently read *Ylst* in this manner.  *See Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014) ("We review the decision of the last state court to issue a reasoned opinion on the issues raised in a habeas petition.") (internal quotation marks and emphasis omitted); *Haliym v. Mitchell*, 492 F.3d 680, 691 (6th Cir. 2007) ("[I]n determining whether a claim is procedurally defaulted, this Court must look to the last *explained* state court judgment.");  *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991) ("Where the last explained state court judgment rejected petitioner's claims on procedural grounds, the presumption [that a later unexplained decision rested on the same grounds] is rebuttable *only* where the petitioner adduces strong evidence that one of the *subsequent* courts reached the merits of the federal claim.") (internal quotation marks and citation omitted) (emphasis added).

presume that a [subsequent state-court] decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst*, 501 U.S. at 803. Thus, the "last *explained* state-court judgment" governs whether AEDPA's heightened level of review applies. *See id.* at 805 (emphasis in original).

Here, the first state court to review Smith's post-conviction petition held that Smith's *Strickland* claim was barred by *res judicata*, but also addressed its merits and found that Smith had not shown that his trial counsel was ineffective. The state-appellate court affirmed, stating "Smith's postconviction petition is barred by the doctrine of res judicata [and therefore] his [ineffective-assistance-of-counsel claim] is rendered moot." The state-appellate court did not consider the merits of Smith's *Strickland* claim; instead, it relied entirely on the procedural ruling. Smith timely appealed the appellate court's decision to the Ohio Supreme Court, which declined jurisdiction and dismissed his appeal.

The "last reasoned opinion" on Smith's ineffective-assistance-of-counsel claim is the decision of the state-appellate court sitting in post-conviction review. That the appellate court entirely relied on procedural default to adjudicate the claim is immaterial. *See Hinkle v. Randle*, 271 F.3d 239, 244–45 (6th Cir. 2001) (holding that the "last reasoned opinion . . . expressly enforced Ohio's contemporaneous objection rule"); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005) (same). Accordingly, because the last reasoned opinion expressly did not reach the merits of Smith's *Strickland* claim, we review Smith's claim *de novo*. *See* 28 U.S.C. § 2254(d) (stating that deference is owed the state court's opinion only if the claim "was adjudicated on the merits").

**III.**

Smith contends that he is entitled to habeas relief because his trial counsel was ineffective in "failing to present evidence that Mr. Biser's death was not caused by behavior that resulted from his head injury; and by failing to seek the testimony of an expert witness to rebut the testimony of the State's witnesses."

**A.**

We first consider whether we may properly address Smith's claim. When "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," our review of the claim is barred unless "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or show "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (adopting "cause and prejudice" standard).

This court has established a four-factor analysis to determine whether a litigant has defaulted under state procedural rules such that habeas review is precluded. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the court determines that the petitioner failed to comply with an adequate and independent state procedural rule, then the petitioner must

demonstrate good cause for his failure to follow the procedural rule as well as actual prejudice from the alleged constitutional error. *Id.*

The final prong of the *Maupin* test is at issue here. This prong allows Smith to avoid procedural default by showing that he had good cause for failing to comply with the state procedural rule and that actual prejudice resulted from the alleged constitutional error. *See id.* The "cause" must be external to Smith and not fairly attributable to him. *See Coleman*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (cause is an "objective factor external to the defense imped[ing] counsel's efforts to comply" with the state procedural rule). If Smith makes this showing, we can review the merits of his petition.

In Ohio, "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings." *State v. Ishmail*, 54 Ohio St. 2d 402, 403–04 (1978). Accordingly, "allegations of ineffectiveness based on facts not appearing in the record should be reviewed through [Ohio's] postconviction remedies." *State v. Coleman*, 85 Ohio St. 3d 129, 134 (Ohio 1999); *Byrd v. Collins*, 209 F.3d 486, 521 (6th Cir. 2000) (stating that Ohio's doctrine of *res judicata* "has been consistently interpreted to stand for the proposition that a claim of ineffective assistance of trial counsel, which is dependent upon evidence outside the record, is to be raised in a post-conviction proceeding rather than on direct appeal"). A post-conviction proceeding constitutes a civil collateral attack on a criminal judgment whereby a criminal defendant may obtain review of "constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained in the trial record." *State v. Turner*, No. 04AP-1143, 2006 WL 391820, at *1 (Ohio App. 10th Dist. Feb. 21, 2006) (internal quotation marks omitted). Thus, when an Ohio court sitting in post-conviction review finds that

a claim is procedurally defaulted, it effectively prohibits the petitioner from introducing evidence into the record for that particular claim.

This court addressed a situation analogous to that of Smith's in *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007), where Richey, a prisoner in Ohio, argued in a post-conviction relief petition that his trial counsel had been ineffective in failing to investigate and refute the State's evidence against him. *Id.* at 348. To show his trial counsel's deficiency, Richey gathered evidence outside the record, provided affidavits of experts challenging the state's trial theory, and presented sworn deposition testimony that showed his trial counsel's "lack of oversight . . . and lack of preparation in seeking to undermine the State's scientific findings." *Id.* at 360. Richey submitted this information with his post-conviction petition. *Id.* The state courts held that Richey's ineffective-assistance-of-counsel claim was procedurally defaulted under the doctrine of *res judicata*, and refused to address the merits of the ineffective-assistance-of-counsel claim. *Id.* The district court denied Richey habeas relief, and this court reversed. *Id.* (stating that "the only way" Richey could have shown the constitutional infirmity "required evidence outside the record").

In *Richey*, this court noted that "[n]one of this testimony was available to Richey on direct appeal precisely because, under Ohio law, direct appeals are confined to the trial record." *Id.* Indeed, in Ohio, asserting an ineffective-assistance-of-counsel claim on direct appeal is nearly always doomed to fail. *See id.*; *see also Williams v. Anderson*, 460 F.3d 789, 800–01 (6th Cir. 2006) (granting habeas relief where the petitioner's attorney raised a claim of ineffective assistance of counsel on direct appeal in Ohio state court because, in doing so, counsel precluded the petitioner from supporting his claim with evidence). Accordingly, the *Richey* court held that *res judicata* did not bar Richey's ineffective-assistance-of-counsel claim, even though it was

raised for the first time in post-conviction proceedings, because the state court would have had no basis for concluding that Richey's counsel was deficient given the state-evidentiary rule. Moreover, the *Richey* court concluded that Richey was prejudiced by his trial counsel failing to gather and present the kind of scientific evidence a reasonably competent attorney would have presented. *Richey*, 498 F.3d at 360.

Here, Smith could have raised an ineffective-assistance-of-counsel claim on direct appeal, but had he done so, he would not have been able to present the evidence necessary to support his claim. *See id.*; *Ishmail*, 54 Ohio St. 2d at 403–04. Smith attached affidavits from both his appellate counsel and an expert endocrinologist to his post-conviction petition. The endocrinologist's report provides an alternate theory of causation, and his appellate counsel's affidavit shows that Smith's trial counsel did not investigate Biser's metabolic condition at all. Without such evidence, Smith would not have been able to argue that he was prejudiced by counsel's allegedly deficient representation. *See Richey*, 498 F.3d at 359–60; *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (stating, in a materially identical context, that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded"); *White*, 431 F.3d at 526–27 (reviewing an ineffective-assistance-of-counsel claim on the merits even though the Ohio courts deemed it procedurally defaulted under Ohio's res judicata rule). Accordingly, we find that we may address the merits of Smith's *Strickland* claim.

**B.**

The right to the effective assistance of counsel at trial is a "critically important" right guaranteed by the Sixth Amendment, and a state prisoner whose conviction rests on a denial of

that right may be entitled to habeas relief. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). To succeed on a *Strickland* claim, a petitioner must show that counsel's performance fell "below an objective standard of reasonableness," 466 U.S. at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.

**1.**

Under the first element of *Strickland*, Smith argues that his trial counsel was constitutionally deficient in failing to investigate the undisputed cause of Biser's death, especially given that trial counsel offered no strategic reason for not doing so.

A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable, professional assistance. *Id.* at 697; *see also Darden v. Wainwright*, 477 U.S. 168, 185–87 (1986). The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The deference a reviewing court must give to counsel's strategic decisions depends on the adequacy of the investigation underlying counsel's decisions. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("'In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" (quoting *Strickland*, 466 U.S. at 691)). Failure to make such an investigation "must be supported by a reasoned and deliberate determination that investigation was not warranted." *O'Hara v. Wigginton*, 24 F.3d 823, 828

(6th Cir. 1994) (interpreting *Strickland*); *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). Simply put, "'[a] lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance.'" *Richey*, 498 F.3d at 362 (quoting *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (interpreting *Strickland*)).

In post-conviction proceedings, Smith's appellate counsel provided an affidavit stating that "[trial counsel] did not conduct *any* investigation into the state of Mr. Biser's metabolic health," and that trial counsel did not inform her "of a strategic reason for not consulting with, or providing the testimony of an endocrinologist, to address the serious state of Mr. Biser's health." Although a competent defense counsel may not have necessarily presented expert testimony regarding Biser's diabetes, such counsel would have, at a minimum, *investigated* the extent and cause of Biser's diabetic ketoacidosis—the undisputed cause of his death—before deciding not to pursue such a theory in challenging causation. *See Bigelow*, 367 F.3d at 570.

Biser died from complications relating to inadequate management of his diabetes. The prosecution attributed that mismanagement to Biser's being disoriented and diminished as a consequence of Smith's punch. It seems clear beyond peradventure that competent counsel in such a situation would explore the severity, extent, and history of Biser's diabetes, the management thereof, as well as the possible consequences of such mismanagement. Smith's trial counsel's failure to conduct such an investigation, coupled with no "reasonable and deliberate determination that investigation was not warranted," leads to the conclusion that Smith's trial counsel was constitutionally deficient. *See Wiggins*, 539 U.S. at 521; *Bigelow*, 367 F.3d at 570.

**2.**

Under the second prong of *Strickland*, Smith must show that counsel's errors were so serious as to deprive him of a trial whose result is reliable. 466 U.S. at 687. A defendant is prejudiced when he can "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In sum, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id*. at 696.

At trial, the jury heard only vague references to Biser's metabolic state. For example, the medical examiner stated that Biser's blood-glucose level of 465 required medical attention, but did not explain that such a condition, in and of itself, could be life threatening. Indeed, the medical examiner knew very little about diabetes; he testified only that Biser's "diabetes was very much out of control," before stating "[Biser] is a diabetic which requires as I understood the record, insulin." Beyond simply hearing unexplained numbers (*i.e.*, blood-glucose levels of 28, 465, and 1,169) and an unfamiliar cause of death (*i.e.*, diabetic ketoacidosis), the jury was entirely unaware of the extent of Biser's metabolic condition. Without at least *some* explanation of Biser's state of health beyond his head injuries, the jury had no real basis to question the prosecution's theory that Smith's punch caused Biser's death.

In post-conviction proceedings, Smith presented the expert report and testimony of Dr. Christofides, an endocrinologist, who opined that Biser was "disinterested, lackadaisical, and incompetently managing his diabetes before" Smith punched him, and thus the head trauma Biser suffered did not necessarily cause Biser's death. Dr. Christofides explained that Type-1

diabetics should not be using the insulin Biser used, and that Biser's severe mismanagement of his diabetes could have caused his death notwithstanding his head trauma. Dr. Christofides could not testify about Biser's condition with particularity because she "simply ha[d] no information on his diabetes care"—Biser had not sought treatment and thus did not have any relevant medical records—but she stated that Biser's A1C level, a metabolic measurement showing Biser's blood-sugar levels for the previous two-to-three months, showed that Biser had been dangerously mismanaging his diabetes prior to the assault. According to Dr. Christofides, Biser's mismanagement would certainly cause him severe health problems, and could rise to the level of being fatal.

The State's case rested on the circumstantial timing of Biser's death vis-à-vis Smith's punch and the allegation that the punch caused brain damage that left Biser unable to care for himself. The State did not contest that Biser died from diabetic ketoacidosis, not brain injuries. Rather, it invited the jury to conclude that Biser's life was cut short because Smith's punch rendered him unable to adequately manage his diabetes. Dr. Christofides (or any endocrinologist) could have presented testimony supporting that Biser's diabetes (and mismanagement thereof) itself caused his death. Dr. Christofides (or any endocrinologist) could have supported that Biser had severely mismanaged his diabetes for at least the two-to-three months prior to his death and likely longer; explained to the jury what was likely occurring in Biser's body given that he had no education or training in how to self-treat the disease; and explained to the jury the consequences when a Type-1 diabetic, like Biser, habitually uses a type of non-prescription insulin that is unsuitable for his disease and disfavored by the medical community.

To be sure, the record suggests that, at a minimum, Biser suffered a severe concussion when he was knocked unconscious by Smith. The brain injuries Biser suffered were not fatal in and of themselves, but they were certainly capable of rendering Biser less competent and could have indirectly affected the regularity of his insulin intake. And Dr. Christofides testified that she could not determine with any level of medical certainty that Biser's diabetic condition would have absolutely led to his premature death. But all of this is beside the point; Dr. Christofides presented an alternate theory of causation, supported by the record, that casts serious doubt on the state's theory and based on which a reasonable jury could have found Smith not guilty of manslaughter. No such evidence was presented to the jury, however. Finally, although Dr. Christofides was not qualified to refute the medical examiner's conclusion regarding the manner of Biser's death, because she is not a forensic pathologist, she could address Biser's underlying medical condition and its effects on his body's ability to function. Ultimately, it was for the jury, not the medical examiner, to decide causation.[5]

Because the "decision reached [by the jury] would reasonably likely have been different" had Smith's trial counsel presented testimony about Biser's metabolic state, *see Strickland*, 466 U.S. at 696, Smith has shown prejudice arising from his trial counsel's deficiency.

## IV.

For the foregoing reasons we **REVERSE** the judgment of the district court and **REMAND** with instructions to enter a conditional writ of habeas corpus giving the State of Ohio six months to retry or dismiss the involuntary-manslaughter charge, and further providing that if the state chooses to dismiss the charge, it shall resentence Smith on the remaining felonious-assault conviction.[6]

---

[5] The trial court gave the jury an instruction on causation.
[6] Again, we recognize that resentencing may or may not result in a change of sentence.