Daniel WORKMAN, Appellee,

v.

Arthur TATE, Appellant.

(WORKMAN I).

Nos. 91–3057, 91–3092.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 4, 1991.

Decided March 2, 1992.

Paul Mancino, Jr., Cleveland, Ohio (argued), *for appellee Workman.*

Suzanne E. Mohr, Office of the Atty. Gen. of Ohio, Columbus, Ohio (argued), *for appellant State of Ohio.*

Before KEITH, RYAN and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

Appellant Arthur Tate (State of Ohio or the state) appeals from an order entered December 6, 1990, in the Northern District of Ohio, Alvin I. Krenzler, *District Judge,* granting appellee Daniel Workman's petition for a writ of habeas corpus with respect to his convictions in the Court of Common Pleas for Cuyahoga County, Ohio on charges of felonious assault and having a weapon while under a disability.

The state asserts that the district court erred (1) in addressing the merits of Workman's petition because he had not exhausted his state remedies; and (2) in applying the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), for determining whether a person is entitled to habeas relief because of the ineffective assistance of counsel.

For the reasons that follow, we affirm in part and reverse in part.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal. Our summary will be more comprehensive and detailed than usual for the reason that we are not insensitive to the delicate state-federal relations when a federal court exercises its statutory duty to review the conviction of a state prisoner pursuant to a petition for a writ of habeas corpus.

Workman was convicted in the state court for the offenses of felonious assault and having a weapon while under a disability. He was convicted chiefly as the result of testimony of several policemen who described the events that occurred outside Mike's Hide–Away Tavern in Cleveland, Ohio on March 8, 1986 at approximately 3:00 a.m.

Detective Candelaria testified that he, Detective Sieniawski, Captain Morales, and another detective were patrolling in un-

---

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

marked police cars. They were investigating bars for the after-hours sale of liquor. They were dressed in plain clothes. Candelaria and Sieniawski saw three individuals leave Mike's Hide–Away Tavern and enter a pick-up truck parked in front of the building. Since they previously had received complaints for after-hours violations at this tavern, Sieniawski entered the bar while Candelaria remained outside peering in through the window. Sieniawski requested a drink, but he was refused service. Sieniawski then rejoined Candelaria outside the tavern, where they continued looking in through a window. Workman, step-brother of the tavern's owner, approached them from behind, pulled out a 38–caliber revolver, put it to the stomach of Sieniawski, and said, "Don't do it friend." Sieniawski grabbed the gun. A scuffle ensued. With the help of Candelaria and the other two officers, who had parked down the street, Workman was subdued. The police officers then brought Workman, who had a bleeding nose and swollen eyes, into the tavern where he was handcuffed. His rights were read to him. Workman later was taken to a hospital for treatment of the injuries he sustained while being arrested.

Sieniawski's testimony was corroborated by that of Candelaria and Morales. Candelaria added that the owner of the bar, Michael Gunnoe, had appeared at the door during the scuffle and that the police officers had told him to go inside.

Gunnoe, a step-brother of Workman, also testified at Workman's trial. He said that he had given Workman his gun along with the day's receipts, which were to be taken home. Workman left the bar shortly after 3:00 a.m. with the bar owner's nephew and a woman. Gunnoe referred to the woman as "his wife", but in fact she, Sherry Ervin Wilkerson, was not married to Workman. Workman, however, was living with Wilkerson, and continued to do so until the time of his trial.

About 15 to 20 seconds after they left the bar, there was a commotion outside. Gunnoe went outside to investigate. One of the police officers put a gun to his head and told him to go back inside. Shortly thereafter, the police brought Workman into the bar and handcuffed him. Gunnoe testified that only one of the police officers, Morales, initially identified himself as such. Gunnoe said that they remained in the bar for 20 to 25 minutes. One of the officers said, "We got to do something now. Let's cite him [Gunnoe]."

The bar owner's testimony was corroborated by that of two patrons who had been sitting at the bar during the events in question.

On the advice of counsel, Workman did not testify at his trial. The two people that Workman was with when he left the bar on the night in question, Sherry Wilkerson and Timothy Osborne, also did not testify at Workman's trial, although they traveled from West Virginia to Cleveland, Ohio specifically for that purpose. Workman contends that he informed his attorney that he had left the bar with Wilkerson and Osborne, and that they were present when the police officers in plain clothes arrested him. He also contends that he told his attorney where they could be reached. Although unaddressed and unmailed subpoenas were issued in the names of Wilkerson and Osborne, Workman's attorney never contacted either of them. He made no attempt to investigate what their testimony might have been. Instead, he simply told Workman to have them show up at trial if he wanted them to testify. At the request of Workman, both Wilkerson and Osborne traveled to the place of trial to testify on behalf of Workman. They arrived at the courthouse at approximately mid-morning on February 27, 1987, the second and final day of the trial. Gunnoe and Workman's brother, Steve Workman, informed them that the court already had finished receiving testimony at the trial. Workman's attorney never spoke to them. Moreover, he made no attempt to obtain a continuance or otherwise delay completion of the trial so that Wilkerson and Osborne could testify. At approximately 11:30 a.m. on February 27, the jury returned a verdict of guilty on the charges of felonious assault and having a weapon under the disability of a prior felony conviction.

Workman was sentenced to a term of eleven to fifteen years on the felonious assault charge, and to a term of one and a half to five years on the charge of having a weapon while under a disability.

Workman took a direct appeal to the Ohio Court of Appeals for the Eighth District on May 26, 1987. He asserted an ineffective assistance of counsel claim, as well as several other claims of error. His ineffective assistance of counsel claim was based primarily on his counsel's failure to obtain the testimony of Sherry Wilkerson and Timothy Osborne. He submitted affidavits of Wilkerson and Osborne to support his claim. The Ohio Court of Appeals held that the affidavits were not part of the record on appeal and therefore could not be considered by that court. The court stated, however, that, since it was unable to consider the issue, *res judicata* would not apply to Workman's ineffective assistance of counsel claim. The court indicated that Workman's claim could best be asserted in a proceeding for post-conviction relief. The court overruled Workman's other claims of error and affirmed his conviction.

On April 8, 1988, Workman sought to appeal to the Ohio Supreme Court, but that court, finding that there were no substantial constitutional questions presented, denied Workman's motion for leave to appeal.

Meanwhile, in July 1987, Workman filed a timely petition for post-conviction relief in the Court of Common Pleas for Cuyahoga County. He again asserted his claim that he was denied effective assistance of counsel. The court dismissed his petition in a one-sentence order, without conducting a hearing and without making findings of fact or conclusions of law.

Workman then appealed to the Ohio Court of Appeals for the Eighth District. That court, in April 1988, remanded the case to the Court of Common Pleas to make findings of fact and conclusions of law. More than two years have elapsed, however, during which the Court of Common Pleas has never made the required findings of fact and conclusions of law, ostensibly due to the "turnover of judges and dispersement of caseloads."

On August 19, 1988, Workman filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 2254 (1988). As in his direct appeal to the Ohio Court of Appeals, Workman asserted several grounds for relief, including, *inter alia,* that there was insufficient evidence presented at trial to convict him of the crimes charged; that he was denied a fair trial and due process because of references made in the prosecution's case to his prior armed robbery conviction, which was more than fifteen years old; that he was denied his right to testify at trial; and that the court instructed the jury outside the presence of Workman and his counsel. Workman's primary claim, however, and that which is the subject of the instant appeal, was that he was denied effective assistance of counsel. The state answered Workman's petition, asserting that Workman's claims lacked merit. The case was referred to a federal magistrate who ordered an evidentiary hearing. Prior to the hearing, the state for the first time contended that Workman's petition should be denied because he had not exhausted his state remedies. At the evidentiary hearing, Workman, Wilkerson and Osborne testified about the events that took place outside Mike's Hide–Away Tavern at approximately 3:00 a.m. on the night of March 8, 1986.

Workman testified that he left the bar with the day's receipts and a gun that his step-brother had given him. Wilkerson and Osborne were with him. Moments after they left the bar, he was grabbed by police officers and repeatedly thrown against the wall. He did not know they were police officers, however, since they were in plain clothes. The officers pulled out their guns and searched him. They took the money and the gun he was carrying. They repeatedly slapped his face against the wall. Workman's step-brother, Gunnoe, stuck his head out the door to find out what was going on, but one of the officers stuck a gun into Gunnoe's face and told him to get back inside. Thereafter Workman was brought into the bar, thrown to the floor, and kicked in the face. Workman testified

that the plain-clothes detectives did not identify themselves as police officers until approximately twenty minutes after the initial scuffle. He therefore was under the impression that he was being robbed.

Osborne and Workman's girlfriend, Wilkerson, who also testified at the hearing before the magistrate, said that Workman's trial counsel never contacted them, either before or after trial. They then described the events in question as follows.

They stated that they left the tavern with Workman between approximately 2:45 and 3:00 a.m. Gunnoe, the bar owner, had given Workman his gun and the day's receipts. Their destination was Gunnoe's house where they were going to stay for the night before heading back to West Virginia in the morning. Just after they left the bar, two men came running up the street. Wilkerson said they came out of a car parked on the street, but Osborne did not mention seeing the car. The men pushed Wilkerson aside, grabbed Workman, and threw him against the wall. Both men were carrying guns, which they drew before frisking Workman. Wilkerson and Osborne both testified that they initially believed Workman was being robbed. They testified that the two men who turned out to be police officers grabbed both the money and the gun from Workman's pocket, and that Workman never had the gun in his hand. Wilkerson said that one of the detectives put the gun to Workman's head and that she "thought they were going to blow his head off." Wilkerson and Osborne testified that the detectives repeatedly slammed Workman's face against the wall before they took him into the bar, and that, at some point, one of the police officers said they had gotten the wrong man.

Wilkerson and Osborne testified that, after the police officers took Workman into the bar, they threw him to the floor and kicked him. They testified that they were not allowed to go back into the bar, so they remained outside looking in through the window. Wilkerson said that the officers who arrested Workman initially did not identify themselves as police officers, and

that she did not know they were police officers until after Workman was taken inside the bar and other officers arrived on the scene. Osborne said that he did not know the men were police officers until he tried to go back inside the bar and they would not let him in. Osborne did not recall seeing the other officers arrive on the scene. After the hearing, the magistrate filed a Report and Recommended Decision on November 20, 1990. Regarding the non-exhaustion defense raised by the state for the first time just prior to the hearing, the magistrate stated, "[t]he state did not raise the non-exhaustion defense in federal court, even when ordered to address the issue, responding only when faced with an order setting an evidentiary hearing on the merits. This case presents special circumstances which requires [sic] consideration of the ineffective assistance claim on the merits." The magistrate found, however, that there were credibility problems with the testimony of Wilkerson and Osborne, and that their testimony was implausible. The magistrate therefore recommended that Workman's habeas petition be denied.

The district court then reviewed *de novo* Workman's habeas petition. The court agreed with the magistrate that Workman's claim of ineffective assistance of counsel should be considered on the merits. The court held, moreover, that counsel's failure to interview and call the two witnesses to testify on Workman's behalf, after Workman told him of their whereabouts and what their testimony would be, amounted to ineffectiveness that denied Workman a fair trial. On December 6, 1990 the court therefore granted Workman's habeas petition.

The state appealed from the district court's order granting Workman's habeas petition. Workman cross-appealed from that part of the court's order which set forth its conclusions as to Workman's additional claims of error at the state trial, none of which has any bearing on the instant appeal. The state primarily contends that habeas relief was improperly granted by the district court because (1) Workman had not exhausted his state remedies as

required by 28 U.S.C. § 2254, and (2) the district court incorrectly applied the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for determining whether a defendant is entitled to habeas relief due to the ineffective assistance of counsel.

## II.

■ Turning first to the state's contention that Workman has failed to exhaust state remedies, we recognize that "'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.'" *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)). Despite the strong public policy requiring a prisoner to exhaust his available state remedies, however, "his failure to do so is not an absolute bar to appellate consideration of his claims." *Granberry v. Greer*, 481 U.S. 129, 131 (1987). This is especially true where, as here, the state has failed to assert the non-exhaustion defense when it initially answered the habeas petition, as required by Rule 5 of the rules governing § 2254 cases in the United States district courts. *Id.* at 134.

The forbearance required of the federal courts is "based on the assumption that the state remedies available to petitioner are adequate and effective to vindicate federal constitutional rights. When those state procedures become ineffective or inadequate, the foundation of the exhaustion requirement is undercut and the federal courts may take action." *Shelton v. Heard*, 696 F.2d 1127, 1128 (5th Cir.1983) (citation omitted); *see also United States ex rel. Hankins v. Wicker*, 582 F.Supp. 180, 182 (W.D.Pa.1984), *aff'd*, 782 F.2d 1028 (3rd Cir.), *cert. denied*, 479 U.S. 831 (1986). Pursuant to 28 U.S.C. § 2254(b), habeas relief generally should not be granted until the prisoner has exhausted his state remedies, unless there exist "circumstances rendering such processes ineffective to protect the rights of the prisoner."

■ Inordinate delay in adjudicating state court claims can be such a circumstance, *Hankins v. Fulcomer*, 941 F.2d 246, 250 (3rd Cir.1991); *Schandelmeier v. Cunningham*, 819 F.2d 52, 55 (3rd Cir. 1986), especially where, as here, the state clearly is responsible for the delay. *Harris v. Champion*, 938 F.2d 1062, 1066 (10th Cir.1991). Indeed, the principle that federal courts should defer to state courts in the interest of comity assumes that the state courts will give prompt consideration to claims of violation of constitutional rights. *West v. State of Louisiana*, 478 F.2d 1026, 1034 (5th Cir.1973), *vacated in part on other grounds*, 510 F.2d 363 (5th Cir.1975).

In the instant case, Workman's petition for post-conviction relief has languished in the state courts for more than three years without the Court of Common Pleas making the required findings of fact and conclusions of law. The state can point only to the "turnover of judges and dispersement of caseloads" as the reasons for the delay. Moreover, as stated above, when the state answered Workman's habeas petition, it did not inform the district court that Workman had not exhausted his state remedies; rather, the state sought to challenge Workman's petition on its merits.

We hold that the district court properly rejected the state's claim of nonexhaustion of state remedies and considered the petition on its merits.

## III.

■ We turn next to the state's claim that the district court erred in granting Workman habeas relief from his state court conviction due to the ineffective assistance of counsel.

In *Strickland, supra*, 466 U.S. 668, the Supreme Court set forth the now familiar two-prong test for determining whether a defendant's conviction should be overturned due to the ineffectiveness of counsel. A defendant bears the heavy burden of showing that counsel's representation was so deficient that the defendant essentially was denied the counsel guaranteed by the Sixth Amendment, and that he was

prejudiced by counsel's performance. *Id.* at 687.

We must scrutinize the effectiveness of counsel's performance with great deference, taking pains to avoid the distortion of hindsight in order to evaluate counsel's conduct from the perspective of counsel at the time. *Id.* at 689. Counsel's performance was ineffective only if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690; *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986). Moreover, the defendant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 694.

In the instant case, Workman contends that his counsel's failure even to contact Wilkerson and Osborne, the two people Workman was with during the events which precipitated his arrest, and counsel's subsequent failure to have them testify at Workman's trial, constituted ineffective assistance that deprived him a fair trial. The district court held that the performance of Workman's counsel was less than professionally reasonable, and that Workman was prejudiced by counsel's errors. We agree.

### (A)

Although counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690, "counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Where counsel fails to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. *United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658 n. 3 (7th Cir.1984);

*see also Osborn v. Shillinger,* 861 F.2d 612, 627 (10th Cir.1988); *United States v. Debango,* 780 F.2d 81, 85 (D.C.Cir.1986); *Crisp v. Duckworth,* 743 F.2d 580, 584 (7th Cir.1984), *cert. denied,* 469 U.S. 1226 (1985); *Thomas v. Lockhart,* 738 F.2d 304, 308 (8th Cir.1984).

Wilkerson and Osborne were the only witnesses, aside from Workman and the police officers, who saw what happened outside Mike's Hide–Away Tavern at approximately 3:00 a.m. on March 8, 1986. The witnesses called to testify on Workman's behalf at trial were all inside the bar while the events that precipitated Workman's arrest occurred outside. A reasonable defense attorney would have recognized that, at least potentially, Wilkerson and Osborne were two very critical witnesses for Workman's defense.

Furthermore, this was not a case where it was unlikely that further investigation would bear fruit, so that counsel's failure to investigate could be excused. *Cf. McFadden v. Cabana,* 851 F.2d 784, 789 (5th Cir.1988), *cert. denied,* 489 U.S. 1083 (1989). Nor is this a case where the defendant gave counsel reason to believe that further investigation would be in vain. *Cf. Strickland, supra,* 466 U.S. at 691. Here, Workman informed counsel that he was with Wilkerson and Osborne as he left the bar and was arrested, and he informed counsel where they could be reached. Counsel did not dispute Workman's claims. Moreover, the other witnesses, Gunnoe and the others who were inside the bar at the time of Workman's arrest, confirmed that Workman was with Wilkerson and Osborne as he left the bar. If counsel had interviewed these other witnesses prior to trial, he would have known that Wilkerson and Osborne were with Workman as he left the bar.

Counsel need not have been clairvoyant to uncover the fact that Wilkerson and Osborne were with Workman when he left the bar; nor would more than reasonable prudence have been required for counsel to recognize that their testimony potentially was critical to Workman's defense.

We hold that counsel's failure even to interview Wilkerson and Osborne, and his subsequent failure to call them as witnesses, constituted ineffective assistance.

### (B)

Under the second prong of the test set forth in *Strickland*, Workman must show that counsel's errors were "so serious as to deprive him of a fair trial, a trial whose result is reliable." *Allen v. United States*, 921 F.2d 78, 80 (6th Cir.1990), *cert. denied*, 111 S.Ct. 2896 (1991). He "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland, supra*, 466 U.S. at 693. Rather, Workman must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir.1987), *cert. denied*, 485 U.S. 970 (1988); *see also Montgomery v. Petersen*, 846 F.2d 407, 416 (7th Cir.1988). Due to counsel's ineffective assistance, Wilkerson and Osborne did not testify at Workman's trial. Although their testimony also would have helped corroborate the testimony of the witnesses who had been inside the bar when Workman was arrested, their testimony would not have been merely cumulative. Wilkerson and Osborne were the only witnesses, other than Workman himself and the police officers, who saw what happened during the moments leading up to Workman's arrest. Their testimony would have contradicted directly the testimony of the police officers who arrested Workman. Moreover, their testimony would have raised a possible explanation for the officer's behavior, namely, that the officers had mistaken Workman for another man.

While we recognize that neither Wilkerson nor Osborne were disinterested witnesses, we believe that there was a reasonable probability that the jury would have found Workman not guilty on the charge of felonious assault if they had testified at Workman's trial. *Strickland, supra*, 466 U.S. at 695.

We therefore affirm that part of the district court's order that granted Workman habeas relief as to his conviction for felonious assault.

As for Workman's conviction for having a weapon while under a disability, however, we believe that Workman was not prejudiced by his counsel's failure to contact Wilkerson and Osborne. Workman admits that he was carrying Gunnoe's gun at the time of his arrest. The testimony of Wilkerson and Osborne would have substantiated that fact. Counsel's ineffectiveness did not undermine the reliability of the jury's verdict on that charge.

We therefore reverse that part of the district court's order that granted Workman habeas relief as to his conviction for having a weapon while under a disability.

### IV.

To summarize:

The failure of Workman's counsel even to contact Wilkerson and Osborne, the only witnesses other than the arresting officers and Workman himself who saw the events which precipitated Workman's arrest, constituted ineffective assistance of counsel. As for his conviction for felonious assault, Workman was prejudiced by his counsel's ineffectiveness; so we affirm as to this conviction.

As for his conviction for having a weapon while under a disability, Workman was not prejudiced by his counsel's ineffectiveness; so we reverse as to this conviction.

For the reasons stated above, we affirm in part and reverse in part the order of the district court which granted Workman habeas relief as to both convictions. Since Workman will have been incarcerated for *five* years on February 27, 1992 pursuant to a *one and one half to five year sentence* on the charge of having a weapon while under a disability, we order that the mandate issue forthwith.