RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ANDREW DEAN JOHNSON,

          *Petitioner-Appellant,*

    *v.*

CATHERINE S. BAUMAN, Warden,

          *Respondent-Appellee.*

No. 20-2181

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12423—Denise Page Hood, Chief District Judge.

Argued:  January 12, 2022

Decided and Filed:  February 22, 2022

Before:  GIBBONS, READLER, and MURPHY, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  David L. Moffitt, LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES, PLLC, Bingham Farms, Michigan, for Appellant.  Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

    READLER, J., delivered the opinion of the court in which MURPHY, J., joined in full, and GIBBONS, J., joined in the judgment.  GIBBONS, J. (pg. 18), delivered a separate opinion concurring in the judgment.

_____

**OPINION**

_____

CHAD A. READLER, Circuit Judge.  Andrew Johnson, a Michigan prisoner, filed a petition for a writ of habeas corpus in federal district court.  In his petition, Johnson alleged that his plea and sentencing proceedings in state trial court violated the federal Constitution.  Pending before that same state trial court, however, is a postconviction motion for relief, one that raises the same issues Johnson asks the federal courts to resolve in a habeas posture.  The district court dismissed Johnson's petition due to his failure to exhaust the remedies available to him in state court.  We now affirm.

**I.**

Andrew Johnson pleaded no contest in state court to three state criminal offenses:  one count of delivering 50 to 449 grams of cocaine, one count of delivering less than 50 grams of heroin, and one count of possessing marijuana.  He was sentenced as a habitual offender pursuant to Mich. Comp. Laws § 769.12 and, per his plea agreement, received a sentence at the bottom of his guidelines range:  99 months to 30 years' imprisonment for his cocaine conviction and 46 months to 30 years for his heroin conviction, to be served concurrently, and time served for his marijuana conviction.

In December 2015, Johnson, represented by new counsel, filed a motion for postconviction relief with the state trial court.  The motion requested two forms of relief.  One, to withdraw Johnson's no-contest plea because his trial counsel was ineffective.  And two, a resentencing because the trial judge violated Johnson's Sixth and Fourteenth Amendment rights by basing his sentence on a fact not admitted or proved beyond a reasonable doubt.  A hearing on Johnson's motion was set for June 2016.  When the prosecution disputed many of the factual claims made in Johnson's motion, however, the hearing was cancelled.  In March 2017, Johnson filed a discovery motion (and not long thereafter, an amended motion) seeking to compel his trial counsel to produce his case files and sit for an interview with Johnson's new counsel.  Following a hearing, the trial court granted the discovery motion, ordering Johnson's trial counsel to

provide the case files, sit for an interview, and appear in person with his files at any future evidentiary hearing. That interview apparently never took place, but Johnson did eventually secure an affidavit from his trial counsel.

Johnson, however, did not file his trial counsel's affidavit (or any other evidence) with the state court. And while the trial court clerk, at Johnson's request, filed Johnson's sentencing and plea transcripts with the trial court, Johnson did not ask the trial court to allow him additional discovery, to set a date for an evidentiary hearing, or to rule on his postconviction motion. Instead, in August 2019, just two months after the filing of his plea and sentencing transcripts, Johnson filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. In his petition, Johnson acknowledged that the state trial court had not yet ruled on his postconviction motion, a fact that ordinarily would mean he had failed to satisfy 28 U.S.C. § 2254(b)(1)(A)'s state exhaustion requirement, a threshold obligation for a petitioner seeking federal habeas relief. But he asserted that special circumstances existed due to "the inordinate delay on behalf of the state courts in addressing [his] claims," making resolution of his petition appropriate under § 2254(b)(1)(B).

The district court dismissed the petition without prejudice. To the district court's eye, there was no inordinate delay in state court because any delay was attributable to Johnson, in particular his failure to request an evidentiary hearing in state court. Because it dismissed Johnson's petition for failure to exhaust, the district court did not reach the merits of Johnson's constitutional arguments.

## II.

On appeal, Johnson asks us to grant his petition for a writ of habeas corpus to remedy the state court's purported constitutional violations in entering his sentence. The district court did not reach those issues, however, because it believed Johnson had not exhausted the remedies available to him in state court. Because exhaustion "is a threshold question that must be resolved before" a court may grant habeas relief, *Wagner v. Smith*, 581 F.3d 410, 415 (6th Cir. 2009), that is where we begin, reviewing de novo the district court's holding that Johnson failed to satisfy the exhaustion requirement, *Pirkel v. Burton*, 970 F.3d 684, 691–92 (6th Cir. 2020).

**A.**

Dubbed the "great and efficacious writ" by Sir William Blackstone, a writ of habeas corpus is in essence an order requiring a detainee's appearance before a tribunal to determine whether his detainment is lawful.  3 William Blackstone, *Commentaries* \*131; *see also Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (explaining that a writ of habeas corpus directs the recipient to "produce the body of [the petitioner] before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary" (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885))).  In view of the writ's remarkable force—in particular, "its ability to cut through barriers of form and procedural mazes," *Harris v. Nelson*, 394 U.S. 286, 291 (1969)—Congress has limited the authority of federal courts to entertain petitions for a writ of habeas corpus, *see Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1974 n.20 (2020) ("[T]he scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day.").

One such limitation is set forth in 28 U.S.C. § 2254(b).  There, Congress provided that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."  § 2254(b)(1)(A); *see also* Act of June 25, 1948, ch. 646, 62 Stat. 869, 967 (enacting exhaustion requirement); Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218–19 (reenacting in substantially the same form).  Section 2254(b)(1)(A)'s exhaustion requirement is grounded in the familiar principle of comity.  In practice, it affords due respect to the operations of state courts by ensuring that a federal court will "not seek to upset a state court conviction on the basis of an alleged constitutional violation that the state court never had an opportunity to correct."  *Allen v. Mitchell*, 953 F.3d 858, 866 (6th Cir. 2020); *see also Ex parte Royall*, 117 U.S. 241, 251 (1886).

**B.**

Like many rules, however, § 2254's exhaustion requirement has its exceptions.  Congress codified two in § 2254(b)(1)(B).  One is relevant here:  a petitioner's failure to exhaust may be

excused where "circumstances exist that render [the state's corrective] process ineffective to protect the rights of the applicant." § 2254(b)(1)(B)(ii).

**1.** In interpreting Congress's command in § 2254(b)(1)(B)(ii), we begin, as always, with the statute's text, "giving the words used their ordinary meaning." *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018). Two terms stand out. First, the statute permits excusing failure to exhaust only when the petitioner shows "circumstances" that warrant excusal. "Circumstances," both at the statute's enactment in 1948 and today, are background events that occur independent of one's volitional conduct. *See Circumstance*, Webster's New International Dictionary 489 (2d ed. 1949) (A "condition[] under which an event takes place or with respect to which a fact is determined."); *see also Circumstance*, The American Heritage Dictionary 338 (5th ed. 2018) ("[F]actors beyond willful control."). Second, a petitioner's failure to exhaust may be excused only if the state court process is "ineffective." As that term has generally been understood, a process is considered "ineffective" if it is "incapable of producing" the intended effect. *Ineffective*, Webster's New International Dictionary 1271 (2d ed. 1944); *see also Ineffective*, Webster's New World College Dictionary 743 (5th ed. 2020) ("Not capable of performing satisfactorily."). Putting these terms together, the text of § 2254(b)(1)(B)(ii) indicates that exhaustion is required unless an event beyond the petitioner's control makes the state court process incapable of resolving the petitioner's claim. This demanding standard is echoed in § 2254(c), where Congress instructed that a petitioner has not exhausted his state remedies if "he has the right under the law of the State to raise, *by any available procedure*, the question presented." 28 U.S.C. § 2254(c) (emphasis added).

**2.** Our reading of the text is further informed by background principles of federal habeas jurisprudence that predate the exhaustion requirement's codification in 1948. "Existing law," the Supreme Court has explained, "was made a part of [§ 2254]." *Young v. Ragen*, 337 U.S. 235, 238 n.1 (1949); *see also Sekhar v. United States*, 570 U.S. 729, 732 (2013) ("It is a settled principle of interpretation that . . . Congress intends to incorporate the well-settled meaning of the common-law terms it uses." (quotation omitted)); *United States v. Texas*, 507 U.S. 529, 534 (1993) ("[L]ongstanding is the principle that statutes . . . are to be read with a presumption favoring the retention of long-established and familiar principles." (quotation omitted)). (That

point is reflected in a reviser's note to § 2254, which, for those who find legislative history persuasive, expressly states that the 1948 law enacting the statute is "declaratory of existing law as affirmed by the Supreme Court" in *Ex parte Hawk*, 321 U.S. 114 (1944) (per curiam). H.R. Rep. No. 80-308, at A180 (1947). *But see Chamber of Com. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history." (quotation omitted)).) The words of § 2254 thus have historical meaning, one that reflects the common law standard from the time Congress enacted the statute, a meaning we must bring to bear when interpreting them. *Cf. Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 360 (1959) (Frankfurter, J.) (interpreting the statutory text as "words with a history"); *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) ("At the time of AEDPA's enactment, multiple decisions of this Court applied the miscarriage of justice exception to overcome various threshold barriers to relief. It is hardly unprecedented, therefore, to conclude that Congress intended or could have anticipated a miscarriage of justice exception when it enacted AEDPA." (cleaned up)).

Prior to § 2254's enactment, federal habeas relief largely was unavailable to a state prisoner until he had exhausted available remedies in state court. By way of background, federal habeas relief was generally not available to state prisoners until 1867, when, in the wake of the Civil War, Congress enacted the Habeas Corpus Act, which authorized federal courts to grant the writ to prisoners in state custody. *See* Habeas Corpus Act of 1867, ch. 28, 14 Stat. 385–86; *Edwards v. Vannoy*, 141 S. Ct. 1547, 1567 (2021) (Gorsuch, J., concurring) (explaining that, prior to the Habeas Corpus Act, state prisoners could seek federal habeas relief only if they were federal officers imprisoned for acts taken to implement federal law or foreign officials whose acts implicated the law of nations); *Ex parte Dorr*, 44 U.S. 103, 105 (1845). Not long after the Act's passage, the Supreme Court adopted an exhaustion requirement for state prisoners seeking federal habeas relief. *Royall*, 117 U.S. at 250–53. Animated by principles of comity and federalism, *Royall* held that state prisoners must exhaust all available remedies in state court before filing a federal habeas petition. *Id.* at 252–53. This requirement, the Supreme Court emphasized, applied in all instances save for those where a prisoner demonstrated "special circumstances requiring immediate action" by the federal habeas court. *Id.* at 253; *see also Ex parte Hawk*, 321 U.S. at 117 (explaining that federal courts will "interfere with the

administration of justice in the state courts only in rare cases where exceptional circumstances of peculiar urgency are shown to exist" (quotation omitted)).

In practice, these "special circumstances" were few and far between. Prior to the enactment of § 2254, the Supreme Court recognized only two exceptions to the exhaustion requirement. *Wade v. Mayo*, 334 U.S. 672, 692–96 (1948) (Reed, J., dissenting) (describing recognized exceptions). The first excused a failure to exhaust when immediate habeas relief was necessary to vindicate an overriding federal interest. *See, e.g.*, *Urquhart v. Brown*, 205 U.S. 179, 182 (1907); *Davis v. Burke*, 179 U.S. 399, 402 (1900); *Whitten v. Tomlinson*, 160 U.S. 231, 241–42 (1895); *Royall*, 117 U.S. at 251. Broadly speaking, these cases arose in three scenarios. One, where a state prisoner's detention impaired the federal government's operations, as when state authorities imprisoned federal officers for performing their federal duties. *See Ohio v. Thomas*, 173 U.S. 276, 284–85 (1899); *In re Neagle*, 135 U.S. 1, 71–76 (1890). Two, where a state prisoner's detention impeded the administration of justice in federal tribunals. *See In re Loney*, 134 U.S. 372, 375–77 (1890) (petitioner, held by state authorities on charges of perjury committed before a federal officer, was needed for further testimony in federal tribunals). And three, where a state prisoner's continued detention was detrimental to the federal government's relationship with a foreign nation. *Wildenhus's Case*, 120 U.S. 1, 17–18 (1887) (foreign citizen allegedly held in violation of treaty with foreigner's home nation). These exceptions were limited, however, in both number and scope. *See, e.g.*, *United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 15, 17–19 (1925) (refusing to excuse exhaustion where the petitioners, two Seneca Indians, claimed their detention violated federal treaties with the Seneca Nation); *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 7–8 (1906) (declining to excuse the petitioner's failure to exhaust where a factual dispute existed as to whether the petitioner was acting in furtherance of his duty to protect federal property).

The second exception excused a petitioner's failure to exhaust when the state court process was "under the domination of a mob" and, as a result, provided "only the form of a court" without the substance. *Ashe v. United States ex rel. Valotta*, 270 U.S. 424, 426 (1926) (Holmes, J.); *see also Moore v. Dempsey*, 261 U.S. 86, 87, 91–92 (1923) (Holmes, J.) (remanding for an evidentiary hearing because the petitioners' allegations that they were

"convict[ed] under the pressure of a mob," if true, made their trial "absolutely void"); *Frank v. Mangum*, 237 U.S. 309, 350 (1915) (Holmes, J., dissenting) (declaring it is the "duty" of a federal court to "declare lynch law as little valid when practiced by a regularly drawn jury as when administered by one elected by a mob intent on death").

**3.** As these background principles make clear, the plain text of § 2254(b)(1)(B)(ii) indicates that exhaustion is a prerequisite for habeas review absent exceptional circumstances beyond the petitioner's control that either (1) render the state court process incapable of vindicating federal interests or (2) functionally foreclose state court review. Our obligation to apply statutory text in accordance with its common meaning takes on added significance in this federal habeas setting, where Congress has long had primary authority over the scope of and conditions on relief. *See* 28 U.S.C. ch. 153; Judiciary Act of 1789, ch. 20, 1 Stat. 73, 81–82 (first statute authorizing federal courts to grant habeas relief); Habeas Corpus Act of 1867, ch. 28, 14 Stat. 385–86 (authorizing federal habeas relief for state prisoners); Act of June 25, 1948, ch. 646, 62 Stat. 869, 967 (codifying exhaustion requirement); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous."). Indeed, as has been true from the inception of our federal habeas regime, "the power to award the writ by any of the courts of the United States[] must be given by written law." *Ex parte Bollman*, 8 U.S. 75, 94 (1807).

## C.

Despite these straightforward textual commands and a deep body of case law excusing a petitioner's failure to exhaust only in narrow circumstances, over time the federal appellate courts have crafted a test for excusing a failure to exhaust that in many respects is unfaithful to Congress's formulation in § 2254(b)(1)(B)(ii). Rather than ask whether the state court process is "*ineffective* to protect the rights of the applicant," many courts have instead excused a petitioner's failure to exhaust where the petitioner shows an "inordinate delay" in the state court's resolution of the petitioner's postconviction motion. *See Workman v. Tate*, 957 F.2d 1339, 1344 (6th Cir. 1992) (collecting cases). Taken at face value, that standard arguably could lower the bar a petitioner must clear to excuse a failure to exhaust. Fairly understood, the term "inordinate" suggests that exhaustion may be excused if a federal court believes simply that the

length of the state court process was "excessive" or "immoderate." *Inordinate*, Webster's New International Dictionary 1283 (2d ed. 1944); *see also Inordinate*, The American Heritage Dictionary 905 (5th ed. 2018) ("Exceeding reasonable limits."). But a lengthy proceeding, while in some instances lamentable, does not always leave a petitioner incapable of securing his rights—that is, in the words of the statute, does not necessarily imply that "circumstances" beyond the petitioner's control have rendered the "process ineffective to protect [his] rights," 28 U.S.C. § 2254(b)(1)(B)(ii).

Where did this exception come from? Not the pre-1948 era, it seems. As a historical matter, no federal court, to our knowledge, ever excused a state prisoner's failure to exhaust merely due to delay in state court proceedings. *Cf. Markuson v. Boucher*, 175 U.S. 184, 185 (1899) (declining to excuse the petitioner's failure to exhaust when he alleged that his one-year sentence would be completed before he could fully exhaust); *Baker v. Grice*, 169 U.S. 284, 293 (1898) (declining to excuse the petitioner's failure to exhaust even though the state had "omi[tted] to move the case for [a new] trial" and the "defendant was eager and anxious for trial" but was out on bail and had not made "such anxiety and eagerness known to the state authorities"). Short of a petitioner making the demanding showing that state remedies were ineffective to vindicate his constitutional rights, both the Supreme Court and our Court required a state prisoner to exhaust state court remedies. *See Ex parte Davis*, 318 U.S. 412, 412 (1943) (per curiam) (refusing to excuse exhaustion when the Supreme Court of Indiana denied an indigent pro se prisoner's request for a transcript); *McCrea v. Jackson*, 148 F.2d 193, 197–98 (6th Cir. 1945) (concluding a prisoner had failed to exhaust when he could apply for leave to file an untimely motion for a new trial in state court).

By all accounts, the "inordinate delay" standard is more a product of judicial decision making (and confused decision making at that) than an effort to interpret a statutory text. Consider, on this point, our own Court's experience with the inordinate delay exception. Our seminal case in the area, *Workman v. Tate*, borrowed the exception from earlier decisions of the Third and Tenth Circuits. 957 F.2d at 1344. Those courts, for their part, justified the exception on the twin considerations that the exhaustion requirement "does not limit the jurisdictional power of the court to issue a writ," *Codispoti v. Howard*, 589 F.2d 135, 140 (3d Cir. 1978), and

that the "delay of the post-conviction remedy may very well work a denial of due process," *Kelly v. Crouse*, 352 F.2d 506 (10th Cir. 1965) (per curiam). Neither circuit, however, purported to derive those notions from the text of § 2254. Instead, their guiding light was the Supreme Court's notorious decision in *Fay v. Noia*, 372 U.S. 391 (1963), one that, over time, has dimmed, with the opinion largely discarded to the dustbin of legal history. *See, e.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 87–90 (1977) (overruling *Fay*'s holding that procedural default in state court does not bar federal habeas review unless the petitioner has deliberately bypassed state procedures); *Schneckloth v. Bustamonte*, 412 U.S. 218, 252–56 (1973) (Powell, J., concurring) (criticizing *Fay*'s "revisionist view of the historic function that writ was meant to perform"). *Fay*'s results-oriented approach left the availability of the writ to turn on the Court's desire to "achieve[] . . . swift and imperative justice on habeas corpus." 372 U.S. at 435. Conspicuously, the opinion paid only lip service to the text of § 2254 and the pre-statutory exhaustion doctrine. *See id.* at 419 (passingly observing that "this doctrine . . . is now codified in 28 U.S.C. § 2254"). And even then, *Fay* mischaracterized prior law, describing the pre-statutory exhaustion requirement as "a rule of discretion, avowedly flexible." *Id.* at 426. History, it is fair to say, has not been kind to *Fay*'s approach. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("*Fay* was based on a conception of federal/state relations that undervalued the importance of state procedural rules."); Stephen A. Saltzburg, *Habeas Corpus: The Supreme Court and the Congress*, 44 Ohio St. L.J. 367, 384 (1983) (arguing that *Fay* is "written as if the task of the Supreme Court were to decide how much collateral review of state convictions is desirable," when in reality "Congress makes this judgment when it enacts a habeas corpus statute"); Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 170–71 (1970) (noting that "[t]he very historians cited in [*Fay*] disagree with [the] conclusion" that "habeas as known at common law permitted going behind a conviction by a court of general jurisdiction").

*Fay*, as well as the cases that purportedly followed *Fay*, together illustrate the perils of courts not adhering to legislative commands. *See* The Federalist No. 51 (Alexander Hamilton) (emphasizing the separation of powers); Federalist No. 78, at 427 (Alexander Hamilton) (E.H. Scott ed., 1898) (explaining that courts interpret laws, not make them). Consider, on this point, that *Fay* neither interpreted the relevant statutory text nor mentioned an inordinate delay standard, let alone purported to draw that standard from the text. Instead, it employed a

purposivist reading of the habeas statute to conclude that the "flexible concept" of "discretion" is the core factor in applying the habeas exhaustion rule. *Fay*, 372 U.S. at 438. And in the aftermath of *Fay*, lower federal courts leaned on this "flexible" notion of "discretion" to invent the inordinate delay exception. The first decision to suggest such an exception came 17 years after § 2254 was enacted, in a clause of pure dictum. *See Kelly*, 352 F.2d at 506. And after *Kelly*, adventurous federal courts, unmoored from the text and history of § 2254, further relaxed the statutory standard for relieving a petitioner of his duty to exhaust. Far from excusing exhaustion only when circumstances arise to make a state court process "*ineffective* to protect the rights of the applicant," courts have instead excused exhaustion where the state court process was merely "inadequate," *Adkins v. Bordenkircher*, 674 F.2d 279, 281 (4th Cir. 1982), *overruled on other grounds by Meadows v. Holland*, 831 F.2d 493 (4th Cir. 1987), not "meaningful," *Gray v. Greer*, 707 F.2d 965, 968 (11th Cir. 1983) (per curiam), or resulted in "undue" delay, *Jenkins v. Gramley*, 8 F.3d 505, 508 (7th Cir. 1993). We too have flirted with this loose approach, suggesting that exhaustion may be excused simply where a petitioner demonstrates "unusual" circumstances. *Phillips v. White*, 851 F.3d 567, 576 (6th Cir. 2017) (quoting *Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000)). These standards are a far cry from the exhaustion requirement that Congress codified in § 2254, let alone the Supreme Court's instruction that an unexhausted habeas petition may be considered "only if there is *no* opportunity to obtain redress in state court or if the [state] corrective process is so clearly deficient as to render *futile* any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (per curiam) (emphasis added).

Judicial discretion must give way to legislative command. With Congress having articulated statutory exhaustion requirements in § 2254, we are not free to devise new exceptions whenever we feel the circumstances so warrant. *See* 28 U.S.C. § 2254(b) (instructing that a writ of habeas corpus "*shall not* be granted" unless the petitioner has exhausted state court remedies or satisfied one of the statutory exceptions (emphasis added)); *Ross v. Blake*, 578 U.S. 632, 639 (2016) (explaining that "statutory exhaustion provision[s]" are not subject to "judge-made exceptions"); *Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("[J]udgments about the proper scope of the writ are normally for Congress to make." (quotation omitted)). Any other approach in this setting seemingly would afford federal habeas courts "a general power to create equitable carveouts to statutory exhaustion requirements" simply in the name of a court's policy judgment.

*United States v. Alam*, 960 F.3d 831, 835 (6th Cir. 2020).  Put another way, we are not "at liberty to rewrite a statute just because [we] believe that doing so would better effectuate Congress's purposes."  *Keen v. Helson*, 930 F.3d 799, 806 (6th Cir. 2019).

Long story short, the inordinate delay exception, if taken at face value, could exceed the statutory "ineffective" standard, expanding § 2254(b)(1)(B)(ii)'s scope beyond both its text as well as the preexisting exceptions that the statute codified.  Given the exception's genesis in non-binding, out-of-circuit precedent, itself based on long-repudiated logic from *Fay*, the question remains:  can our own precedents on the inordinate delay doctrine be reconciled with the original public meaning of § 2254(b)(1)(B)(ii)?   Given the choice between non-binding, atextual precedent and a statute's original public meaning, we should choose the latter.  *See Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting) (recognizing that when a precedent is incorrect as an "original matter," a court should "tread carefully before extending" that precedent).  With that understanding in mind, we turn to our Court's treatment of the inordinate delay exception.

## III.

Courts tempted to define statutory requirements using non-statutory terms often struggle to determine the meaning of those non-statutory terms.   Our Court's invocation of the nonstatutory term "inordinate delay" is a prime example, as we have yet to explicitly define the term.  Our cases, however, make two things clear with respect to the term's meaning.  One, we have never held that a petitioner demonstrated "inordinate delay" through delay alone. *See Allen v. Dutton*, 41 F.3d 1506, at *2 (6th Cir. 1994) (Unpublished Table Decision) (collecting cases) ("[D]elay in a state court in and of itself is usually not sufficient to merit federal intervention."); *see also Lee v. Stickman*, 357 F.3d 338, 341 (3d Cir. 2004) ("The existence of an inordinate delay does not automatically excuse the exhaustion requirement."); *Jones v. Solem*, 739 F.2d 329, 331 (8th Cir. 1984) (same); *Coe v. Thurman*, 922 F.2d 528, 531 (9th Cir. 1990) ("We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate." (quoting *Barker v. Wingo*, 407 U.S. 514, 521 (1972))).  And two, a failure to exhaust may be excused only if the state is responsible for the delay.  *See Workman*, 957 F.2d at 1344 (finding excusal appropriate "especially where, as here, the state clearly is responsible for the

delay"); *see also Turner v. Bagley*, 401 F.3d 718, 726 (6th Cir. 2005) ("[T]he ultimate responsibility for such circumstances . . . must rest with the government rather than with the defendant." (quoting *Barker*, 407 U.S. at 531)); *Deters v. Collins*, 985 F.2d 789, 796 (5th Cir. 1993) ("[C]ourts are to excuse noncompliance with the exhaustion doctrine *only* if the inordinate delay is wholly and completely the fault of the state." (emphasis in original)).

Although the inordinate delay standard on its face appears to displace the exhaustion doctrine incorporated into § 2254(b)(1)(B)(ii), we have in practice applied these two guideposts—requiring, one, a showing beyond delay itself and, two, that the delay be attributable to the state—in a manner that aligns with the statute's original meaning as well as the common law exhaustion doctrine that preceded the statute. *Cf. Gundy v. United States*, 139 S. Ct. 2116, 2141 (2019) (Gorsuch, J., dissenting) ("When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines."). By requiring something more than mere delay, we seek to ensure that the underlying state court process was truly "ineffective," thereby excusing a failure to exhaust only in those historically "rare cases where exceptional circumstances of peculiar urgency are shown to exist." *Ex parte Hawk*, 321 U.S. at 117 (citation omitted); *see also Allen*, 41 F.3d 1506, at \*2 (declining to excuse for delay alone because "an exception to the exhaustion requirement is warranted only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief" (citing *Duckworth*, 454 U.S. at 3)). And by excusing non-exhaustion only when the delay is attributable to the state, we seek to ensure that the petitioner's failure to exhaust is due to "circumstances" independent of his own conduct that functionally foreclose state court review. *See, e.g.*, *Turner*, 401 F.3d at 726 (explaining that further efforts were "futile" where the state failed to act despite repeated requests from the petitioner). All things considered, the use of the nonstatutory term "inordinate delay" so far has produced results that are consistent with § 2254(b)(1)(B)(ii)'s text and the pre-enactment practice of requiring exhaustion in all but the most extreme circumstances.

Measured against this backdrop, Johnson's request to excuse his failure to exhaust is meritless. Johnson believes his case presents exceptional circumstances because the state court

has purportedly delayed resolution of his postconviction motion. But delay, standing alone, has never been enough. *See Allen*, 41 F.3d 1506, at *2. And at most, less than four years elapsed between the date Johnson filed his initial postconviction motion in state court and the date he filed his habeas petition in the district court. That span of time is one way we have measured delay in state court proceedings. *See Phillips*, 851 F.3d at 574, 576 (calculating "delay" as the time between the filing of a petitioner's motion for postconviction relief and the filing of his federal habeas petition). But within that period, the state court did not sit idle. It set a hearing date, received a response from the prosecution that disputed many of the factual claims in Johnson's postconviction motion, and then granted Johnson's motion seeking discovery to develop his ineffective assistance of counsel claim. In that sense, the relevant period in state court for purposes of measuring "delay" was roughly two years—the period between the state court's order granting Johnson's discovery motion and Johnson's habeas filing. *See Allen*, 41 F.3d 1506, at *2 (noting time since the most recent order in the case). On balance, neither time period is particularly striking when considered against the backdrops of both post-sentencing litigation, which often proceeds incrementally, and the much longer gaps we have addressed in some of our other inordinate delay cases. *See, e.g.*, *Phillips*, 851 F.3d at 576 (six year delay between state court postconviction motion and federal habeas petition); *Turner*, 401 F.3d at 726 (eight year delay). More to the point, a gap of only a few years seems trivial when compared to the historical benchmarks for excusing a failure to exhaust—mob justice or the need to vindicate an overriding federal interest—both of which, unlike mere delay, render a state court process entirely incapable of affording adequate relief. *See, e.g.*, *Ashe*, 270 U.S. at 426; *Whitten*, 160 U.S. at 241–42.

Even if we believed these rather routine developments amounted to some manner of "delay," that delay is "inordinate" only if the state is clearly the responsible party. *Workman*, 957 F.2d at 1344; *Turner*, 401 F.3d at 726. Here, that is not the case. Yes, Johnson's postconviction motion was not fully resolved at the time he sought federal habeas relief. But Johnson identifies no evidence to suggest that the state court interfered with Johnson's ability to obtain that resolution. When Johnson filed his postconviction motion, the state court promptly scheduled a hearing. The record does not indicate why the hearing did not take place, but, again, Johnson presents no evidence that it was due to the state court's malfeasance. Possibly, it was

cancelled because the prosecution disputed many of the factual assertions in Johnson's postconviction motion and Johnson acknowledged that further evidentiary developments were required before his motion could be resolved. Not surprisingly, then, when Johnson filed a discovery motion, the court granted it. And when he requested transcripts of his plea and sentencing hearings, the court clerk produced and docketed them.

As this record reflects, to the extent the state court proceedings were delayed, there is no indication that the state is "clearly . . . responsible." *Workman*, 957 F.2d at 1344. Both the prosecution and the state court were responsive to Johnson's requests, leaving the ball, so to speak, in Johnson's court. Once his plea and sentencing transcripts were filed with the court and he secured an affidavit from his trial counsel, Johnson could have either requested more discovery, requested an evidentiary hearing, or notified the court that he was ready to proceed to the merits of his postconviction motion. But rather than take any of those steps, Johnson instead brought his case to federal court, filing a habeas petition just two months after the state court clerk filed his sentencing and plea transcripts. Throughout his federal proceeding, Johnson conspicuously has failed to explain why he took the extraordinary step of seeking a federal habeas remedy without first seeking further development or resolution of his claim in state court. Suffice to say, § 2254's exhaustion requirements demanded more of him. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) (explaining in the context of procedural default that federal tribunals "are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings").

His unusual litigation choices notwithstanding, Johnson believes that his case is "materially indistinguishable" from three prior cases in which we have excused a petitioner's failure to exhaust: *Phillips*, 851 F.3d 567, *Turner*, 401 F.3d 718, and *Workman*, 957 F.2d 1339. But as noted earlier, these cases, consistent with the text of § 2254 and background principles, excused exhaustion on the basis of "exceptional circumstances of peculiar urgency" that rendered the state court process incapable of affording relief for the petitioners' alleged constitutional violations. *Ex parte Hawk*, 321 U.S. at 117 (citation omitted). Start with *Phillips*. There, the petitioner's motion to vacate his sentence received almost no attention from the state court (save for a single order to produce evidence that Phillips responded to within two months)

for nearly seven years. 851 F.3d at 574. And why, one may wonder, did that motion go unresolved? "[M]ost likely because [the state court judge] was indicted for several offenses . . . and sentenced to imprisonment himself," and was thus unavailable to resolve the motion. *Id.* So it is no wonder that the state ultimately declined to raise any exhaustion defense in the case. *Id.* at 575–76. Or consider *Turner*, where the petitioner's direct appeal languished in state court for nearly 11 years. 401 F.3d at 726. Over that span, the state appellate court allowed four successive court-appointed attorneys to withdraw from representing the defendant without the required appellate brief ever being filed, with the state court ultimately dismissing the appeal for failure to prosecute. *Id.* at 721–23, 725–26.

The state's behavior was perhaps most egregious in *Workman*. There, a state trial court dismissed the petitioner's postconviction motion in a one-sentence order without conducting a hearing and without making any of the necessary factual findings or legal conclusions. 957 F.2d at 1342. The state court of appeals next ordered the trial court to make the required findings. But following remand, the trial court still had not done so nearly three years later. *Id.* And when Workman filed a federal habeas petition, the state neglected to argue in its initial response that Workman failed to exhaust his available remedies in state court. *Id.* at 1344. On that record, it is perhaps no surprise that we attributed the "inordinate delay" in state court to the state itself. *Id.* Especially so, it seems, when the state offered no justification for the delay beyond the generic "turnover of judges and dispersement of caseloads." *Id.* at 1343–44.

The state's behavior here is nothing like the obstinate and contemptible conduct in *Workman*. And measured against the petitioners in these earlier cases, Johnson's efforts have been minimal. Beyond his initial postconviction motion, he has filed only a discovery motion. The state court granted that latter motion, but Johnson did not follow up. That is a far cry, for instance, from the "frequent [and] unavailing" efforts of the petitioner in *Turner*, who repeatedly implored his attorneys to act on his case and, receiving no response, filed a motion to proceed pro se. 401 F.3d at 725–26. Equally true, had the state court ruled on Johnson's motion without allowing him to gather the discovery he requested, that ruling may well have been premature, prompting Johnson to file yet another motion for relief. Nor, for that matter, is Johnson "without

recourse in state court," *id.* at 726; he remains free to seek further evidentiary developments or a merits ruling from the state court.

*     *     *     *     *

All things considered, Johnson's case is not the extreme instance in which circumstances beyond his control have left him "incapable" of remedying the constitutional violations he alleges.  That being so, excusing his failure to exhaust would be at odds with both the carefully tailored legal regime envisioned by Congress as well as the pre-statutory standards that serve as the foundation for that regime.  Section 2254(b)'s exhaustion requirement, remember, promotes comity with state courts.  *Allen*, 953 F.3d at 866.  It ensures that a federal court, sitting in a habeas posture, has the benefit of the state court's reasoned judgment, to which we afford great deference.  *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (explaining that our review is "doubly" deferential where, as here, we review a state court's decision on a petitioner's ineffective assistance of counsel claim).  And it honors the "States' interest in the integrity of their criminal and collateral proceedings." *Williams*, 529 U.S. at 436.  These weighty interests help explain Congress's decision to make the exhaustion requirement absolute in all but the most extreme circumstances.

We affirm the district court's dismissal of Johnson's petition.

---

**CONCURRING IN THE JUDGMENT**

---

GIBBONS, Circuit Judge, concurring in the judgment. I agree that we should affirm the district court's dismissal of Johnson's petition because Johnson failed to show the exhaustion requirement should be excused for inordinate delay. However, I disagree with the majority's implication that the inordinate delay doctrine is somehow inconsistent with 28 U.S.C. § 2254.

Since 1992, this court has recognized an inordinate delay in state court can excuse a petitioner's failure to exhaust. *See Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992). The majority needlessly and incorrectly seeks to undermine this longstanding precedent by characterizing the doctrine as "unfaithful to Congress's formulation in § 2254(b)(1)(B)(ii)." Maj. Op., at 8. The inordinate delay doctrine acknowledges that when "state procedures become ineffective or inadequate, the foundation of the exhaustion requirement is undercut and the federal courts may take action." *Workman*, 957 F.2d at 1344 (citation omitted). This is firmly rooted in § 2254(b)(1)(B)(ii)'s text that a petitioner need not show exhaustion in state court if "circumstances exist that render such process ineffective to protect the rights of the applicant." An inordinate delay in state court can render a state court process ineffective and the majority's attack on our precedent is meritless.[1] *See Phillips v. White*, 851 F.3d 567, 576 (6th Cir. 2017); *Turner v. Bagley*, 401 F.3d 718, 724–27 (6th Cir. 2005); *Workman*, 957 F.2d at 1344.

Ultimately, I concur in the judgment because Johnson has not shown the inordinate delay excuse applies to his case. The state court record shows progress, including granting his discovery motion. However, instead of seeking further relief in state court, Johnson turned to federal court. While the state court certainly bears blame for allowing a pending motion to languish on its docket since 2015, Johnson did not diligently pursue his claims. I agree that Johnson has not shown an inordinate delay such that he is "without recourse in state court" warranting excusal of the exhaustion. *Turner*, 401 F.3d at 726. Therefore, I concur in the judgment.

---

[1]Moreover, this panel "cannot overturn a decision of another panel." *United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000).